UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
JUSTIN TIMPERIO,

|  |  |
|---|---|
| **Plaintiff,** | **COMPLAINT** |
| - against - | **JURY TRIAL**<br>**DEMANDED** |
| **BRONX- LEBANON HOSPITAL CENTER and**<br>**UPSTATE GUNS AND AMMO, LLC,** | **Case No.** |
| **Defendants.** |  |

-----------------------------------------------------------------------x

Plaintiff **JUSTIN TIMPERIO** ("Plaintiff") by his attorneys the Law Offices of

Arnold N. Kriss, as and for his Complaint as against Defendant **BRONX-LEBANON HOSPITAL**

**CENTER** ("Defendant Hospital") and Defendant **UPSTATE GUNS AND AMMO, LLC**

("Defendant Guns") upon information and belief, allege as follows:

### PRELIMINARY STATEMENT[1]

On June 30, 2017, ("June 30th") Defendant Hospital at 1650 Grand Concourse, Bronx,

New York, ("1650 Grand Concourse" or "Premises") was the site of a shooting, killing one

Defendant Hospital doctor, seriously wounding Plaintiff, a first year medical resident, four other

members of the medical staff and one patient. The shootings were committed by a Defendant

Hospital former employee, Dr. Henry Bello ("Bello") who was discharged by Defendant Hospital

in 2015.

---

[1]     The source for this section is based upon information and belief found on the Internet and
news articles concerning Defendant Hospital's shootings that occurred before and on June
30, 2017.

At about 2:50 p.m., Bello entered Defendant Hospital dressed in a doctor's white coat, wearing a hooded sweatshirt and having in his possession, showing or wearing on his white coat a Defendant Hospital identification badge.

Apparently, at the time of Bello's discharge in 2015 from Defendant Hospital, Bello's hospital identification badge was not taken from him by any Defendant Hospital's Human Resources Department staff member who was responsible for exiting Bello as a Defendant Hospital employee.[2]

Under Bello's white coat he secreted a loaded AR-15 rifle and had additional ammunition magazine(s) which he recently purchased at Defendant Guns, a firearm's dealer in Schenectady, New York. In addition, Bello possessed a Tropicana orange juice container containing gasoline which he subsequently used to set fire to Defendant Hospital's 16th floor Nursing Station.

According to news reports, Bello's shooting rampage occurred on Defendant Hospital's 16th and 17th floors.[3]

One thing is eminently clear that on June 30th, Bello was not a Defendant Hospital employee. Instead, he was an intended murderer on a deranged mission, whose unauthorized entry into Defendant Hospital at 1650 Grand Course on June 30th was facilitated by Defendant Hospital's ineffective security system and negligent Defendant Hospital's Human Resources Department.

Plaintiff, a victim of Bello's shooting spree, suffered an entry gunshot wound to his abdomen which exited his right thigh requiring surgical procedures and treatment for his wounds at Defendant Hospital and Mt. Sinai Hospital ("Mt. Sinai") from June 30, 2017, to July 21, 2017.

---

[2]     The *New York Times* reported that, "(Bello), the gunman . . . resigned from the hospital in 2015 after an accusation of workplace sexual harassment." Source: July 4, 2017, *New York Times,* "Bronx-Lebanon, Site of Shooting, Is More Than a Hospital to Neighbors."

[3]     Source: July 2, 2017, *New York Times,* "Details Emerge in Deadly Shooting at Bronx-Lebanon Hospital Center."

As set forth in greater detail in the subsequent Causes of Action, Plaintiff was lucky he survived Bello's June 30th onslaught for the life threatening serious injuries and blood loss he sustained.

After Bello's violent carnage ended, Bello took his life in Defendant Hospital by shooting himself with his own weapon.

Gun violence is not new to Defendant Hospital.

On November 11, 2011, at about 7:00 p.m. a gang member fired several gun shots in Defendant Hospital's Emergency Room. A nurse was hit in the shoulder by the gunfire and a security guard was shot in his groin.[4]

There is no question that after the November 11, 2011, shooting, Defendant Hospital had actual notice that its security system was ineffective. Clearly, Defendant Hospital made no adequate security improvements prior to the June 30th Bello shooting.

Defendant Hospital's failure to repossess Bello's Defendant Hospital's identification badge and Defendant Hospital's ineffective security system created an unsafe environment in this large public hospital which significantly allowed Bello to enter Defendant Hospital with an AR-15 to commit his deadly shooting spree.

It is alleged that Defendant Hospital was grossly negligent by failing to provide a secure and safe location for its staff and patients; wrongfully, negligently and improperly hired Bello; had knowledge on or before June 30th that Defendant Hospital's security system was ineffective; failed to take proper action once Defendant Hospital knew that Bello sexually harassed a Defendant Hospital employee and negligently – deviated from standard personnel practices – permitting Bello to retain Defendant Hospital's property, including his Defendant Hospital's identification badge.

---

[4]    Source: November 11, 2011, *New York Daily News,* "Gangbanger Busted For Wildly Shooting Inside Bronx Lebanon Hospital ER".

Plaintiff, a first year medical resident, is an innocent victim of Bello's rampage.

Plaintiff did not know Bello on or before June 30th.

Plaintiff was not a Defendant Hospital employee when during February 2015 Bello "resigned" from Defendant Hospital's employ after a sexual harassment and/or sexual misconduct complaint was made against Bello by a Defendant Hospital female employee.[5]

Defendant Bello, was a Defendant Hospital employee who Defendant Hospital knew "often had problems with staff members. 'Nobody targeted him, He's just an individual who's out to harm people.'"[6]

Bello's seriously wounding Plaintiff was not an accident connected to Plaintiff's employment as a Defendant Hospital medical resident, but was a random shooting of Plaintiff by Bello while Plaintiff and others were merely in Defendant Hospital.

This is a lawsuit for money damages, seeking compensatory and punitive damages, for the serious physical and life threatening injuries, emotional distress and potential economic harm to Plaintiff.

---

[5]     According to Defendant Hospital's spokesperson Errol Schneer, Bello was a Defendant Hospital "disgruntled" ex-employee who worked at Defendant Hospital from August 2014 to February 2015. Bello "resigned" instead of being terminated due to a workplace sexual harassment allegation. Source: July 1, 2017, *CNN*, NYC Hospital Shooter Was Looking For Ex-Colleague Sources Say." Source: June 30, 2017, *New York Times*, "Bronx Hospital Shooting: What We Know and What We Don't Know."

[6]     Source: July 2, 2017, *New York Times*, "Details Emerge In Deadly Shooting at Bronx-Lebanon Hospital Center," reporting that this quote came from Dr. Sridhar Chilimuri, Defendant Hospital's physician in chief.

- 4 -

## **DEFENDANT GUNS' SALE OF AN AR-15 RIFLE TO BELLO**[7]

On or about June 22, 2017, Defendant Guns sold Bello, a New York City resident, a modified AR-15 rifle at Defendant Gun's place of business in Schenectady, New York.[8]

Defendant Guns holds itself out as "A Family-Owned Gun Shop Offering Small Arms, Long Arms & Gun Safety Classes." Defendant Guns is a member of the National Rifle Association and the New York State Rifle Pistol Association.[9]

Based upon news reports after the June 30th shooting, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") "was investigating whether Bello, 45, was legally allowed to possess the (AR-15)." An ATF's spokesman stated, "We're still looking at (Bello's) background."[10]

Craig Serafini, Defendant Guns' owner, created an issue of fact for this lawsuit claiming in a news report after the June 30th shooting that, "every one of (Defendant Guns') employees follows all state and federal compliance checks. No firearm has ever left our building

---

[7]    The source for this section is based upon information and belief found on the Internet and in news articles concerning Defendant Guns.

[8]    Bello's last known address was 684 Sheridan Avenue, Bronx, New York. Source: July 4, 2017, *New York Daily News,* "Bronx Hospital Gunman Legally Purchased Semiautomatic Rifle." However, other news reports had Bello living in Manhattan at various addresses.

[9]    Source: Defendant Guns website, http://www.upstategunsandammo.com as of February 17, 2018.

[10]    Source: July 4, 2017, *New York Daily News,* "N.Y. Gun Store Legally Sold Rifle to Bronx Hospital Killer."

without going through those checks," concerning the sale of its weapons and specifically the AR-15 rifle to Bello.[11][12]

As this Complaint alleges, Defendant Guns' liability is based upon "negligent entrustment," a violation of *15 U.S. Code § 7903(B), Protection of Lawful Commerce in Arms Act ("PLCAA")*, resulting in a licensed firearm's dealer's liability, for "supplying of a qualified product (AR-15) by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others," and also negligence per se.

One of the factual issues to be decided in this lawsuit is whether Defendant Guns in performing Bello's background check for his purchase of the AR-15 rifle, contacted the New York Police Department ("NYPD") to determine if Bello, a City of New York resident, was issued a rifle permit by NYPD to lawfully possess an AR-15 rifle in the City of New York, where Bello was domiciled.

Notwithstanding past mass casualties and deaths that have been caused by the AR-15, licensed firearms dealers and manufacturers are generally protected from liability under *PLCCA* and New York State's *Secure Ammunition and Firearms Enforcement Act ("NYSAFE")* which permits the sale of a modified AR-15 rifle to individuals after reconfiguring the AR-15, an assault weapon, into a rifle.

It is without question that the modified AR-15 rifle is the semi-automatic weapon of choice in past mass death and casualty shootings.

---

[11] Source: July 2, 2017, *New York Post*, "Bronx Hospital Gunman Legally Purchased Semiautomatic Rifle."

[12] Source: July 2, 2017, *New York Daily News,* "Bronx Hospital Shooter Bought Assault Rifle Days Before Rampage." Serafini, when approached after the June 30th shooting by a *Daily News* reporter about Defendant Guns' sale of the AR-15 to Bello, reportedly responded, "Take a walk, before shutting the door on a *Daily News* reporter."

On July 20, 2012, a mass shooting occurred inside a movie theater in Aurora, Colorado. Twelve people were killed and seventy others were injured. This shooting caused the largest number of victims' casualties in the United States. The shooter was convicted and sentenced to multiple life sentences.

The weapon used was a modified AR-15 that was a legally sold rifle.

On December 14, 2012, at the Sandy Hook Elementary School, Newtown, Connecticut, a 20-year-old fatally shot twenty children between the ages of six and seven years and also six adult educational staff members with an AR-15. After this carnage, the shooter committed suicide by shooting himself.

This shooting incident was classified as the deadliest mass shooting at either a high school or grade school in United States history and resulted in the passage of the *NYSAFE Act* prohibiting AR-15s from being sold in New York State.

On June 12, 2016, after an AR-15 was legally sold, once again it was used in the next mass shooting. The shooter killed forty-nine people and wounded fifty eight others inside a nightclub in Orlando, Florida. The shooter was killed by Orlando Police Department officers.

Recently, on February 14, 2018, another horrific mass shooting occurred at the Marjory Stoneman Douglas High School in Parkland, Florida. The weapon used by this shooter was an AR-15 rifle. Seventeen high school students and staff were killed and fifteen more were wounded. The shooter was arrested in the vicinity of the high school.

This shooting is now described as "one of the world's deadliest school massacres."

The debate about gun control, background checks, the sale of modified AR-15s and that "Guns Don't Kill People, People Kill People" rages after each mass shooting, and then once the news cycle ends, the debate disappears from the national landscape until the next shooting.

The United States Constitution 2nd Amendment states that, "A well regulated militia being necessary to the security of a free State, the right of the People to keep and bear arms shall not be infringed."[13]

But, it is now time in the 21st Century for reason to prevail since mass public area shootings are now all too common events causing the loss of life, especially of our young, collateral grievous family damage and our national shame resulting from these senseless deaths and maimings.

The Executive and Legislative branches have failed to regulate firearms causing the onslaught of these random and deranged shootings. Laws such as *PLCAA* and the *NYSAFE Act* have weakly walked the narrow political line between the 2nd Amendment and protecting our citizens.

It is time to recognize that the gun advocates' slogan of, "Guns Don't Kill People, People Kill People" does not justify the mass deaths and injuries from AR-15s, modified or not, and finally conclude that an AR-15 firearm serves no rational purpose to exist in our society today.

The June 30th shooting at Defendant Hospital may be a case for a court to further discuss whether the 2nd Amendment's "the right of the People to keep and bear arms shall not be infringed," was what the Founding Fathers intended when both the Declaration of Independence and our Constitution were drafted.[14]

Thomas Jefferson in authoring the Declaration of Independence's Preamble, eloquently wrote, *"We the People* of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America."

---

[13]    On December 15, 1791, the Bill of Rights (the first ten amendments to the Constitution) was adopted, having been ratified by three-fourths of the states.

[14]    See, *The New York State Rifle & Pistol Association, et al v, The City of New York, et ano, United States Court of Appeals, (2nd Circuit, February 23, 2018)*.

Clearly, Jefferson's words, to " . . . establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare . . ." is inconsistent with the American nightmare of mass shootings our nation has experienced due to an overly broad interpretation of the 2nd Amendment.

George Washington's letter to the Framers of the Constitution on September 17, 1787, must also be heeded:

> "It is obviously impracticable in the Federal Government of these States to secure all rights of independent sovereignty to each, and yet provide for the interest and safety of all. **Individuals entering into society must give up a share of liberty to preserve the rest. The magnitude of the sacrifice must depend as well on situation and circumstance, as on the object to be obtained. It is at all times difficult to draw with precision the line between those rights which must be surrendered, and those which may be preserved; and, on the present occasion, this difficulty was increased by a difference among the several States as to their situation, extent, habits, and particular interests."** (Emphasis supplied).

Perhaps, it is time for the United States Supreme Court to now reasonably interpret the 2nd Amendment, acknowledging that the world has changed and the public's safety must be a prime concern.

It is respectfully submitted the last hope for us as a nation is for our courts to determine whether it is finally time for "Individuals entering into society must give up a share of liberty to preserve the rest."

## THE PARTIES

1.    Plaintiff is a citizen of St. Catharines, Canada.

2.    Plaintiff is not a United States citizen or a permanent United States resident.

3.    At all times mentioned in the Complaint and presently, Plaintiff has a Certificate of Eligibility For Exchange Visitor Status (J-Non Immigrant) Visa issued on January 27, 2017.

4.    Plaintiff presently resides in New York County within the Southern District of New York.

5.    At all times mentioned in this Complaint, Plaintiff was a Defendant Hospital first year medical resident.

6.    Defendant Hospital is a New York State not-for-profit health care system located at 1650 Grand Concourse, Bronx, New York, within the Southern District of New York.

7.    Defendant Guns, since July 1, 2014, is a New York State domestic Limited Liability Company, located at 3410 State Street, Schenectady, New York 12304.[15]

## THIS COURT'S JURISDICTION AND VENUE

8.    This Court's jurisdiction arises under *28 U.S.C. § 1332(2), Diversity of citizenship; amount in controversy; costs*, since Plaintiff is a Canadian citizen who is not a permanent resident of the United States.

9.    This Court's jurisdiction is also pursuant to *28 U.S.C. § 1332(b)*, since Plaintiff's damages are greater than $75,000.00.

10.    The United States District Court, Southern District of New York is the proper venue for this action.

---

[15]    Source: New York State Department of State website as of February 16, 2018.

## FIRST CAUSE OF ACTION
## DEFENDANT HOSPITAL'S NEGLIGENCE-FAILURE
## TO PROVIDE ADEQUATE PREMISES SAFETY

11.     Plaintiff repeats, reiterates and realleges the allegations set forth in Paragraphs 1 to 10, above as if set forth fully herein and at length.

12.     On June 30th, Defendant Hospital owned, operated, managed, maintained, controlled, secured, supervised and provided in-house security at the Premises.

13.     On June 30th and at all times before and hereinafter, Defendant Hospital as owner, operator and/or supervisor in control of the Premises, had a duty to maintain a reasonably safe Premises and protect Plaintiff and other members of the public from harm or injury while Plaintiff and all others were lawfully on Defendant Hospital's Premises.

14.     On June 30th at about or before 2:50 p.m., due to Defendant Hospital's negligence, Bello unlawfully entered Defendant Hospital's Premises using the Premises' rear entrance on Selwyn Avenue, in possession of Defendant Hospital's property, specifically a Defendant Hospital's identification badge, without any Defendant Hospital security employee challenging or stopping Bello from entering Defendant Hospital's Premises which allowed Bello to proceed to Defendant Hospital's 16th and 17th floors armed with an AR-15 rifle.

15.     With the outside temperature reaching almost 90 degrees, Bellow was dressed in a white lab coat, wearing a hooded sweatshirt concealing his identity and carrying an AR-15 rifle as he walked in the vicinity of Defendant Hospital's security desk after entering the Selwyn Avenue entrance.[16] [17]

---

[16]     Source: July 2, 2017, *New York Times,* "Details Emerge In Deadly Shooting at Bronx-Lebanon Hospital Center," reporting that Bello's entrance to Defendant Hospital was captured on Defendant Hospital's surveillance camera at the Selwyn Avenue entrance that Bello used.

[17]     According to the June 30th AccuWeather Forecast for Bronx, New York, the actual outside temperature was a high of 89 degrees with a low of 75 degrees.

16. In 2015, after Bello was terminated from his Defendant Hospital employment, Defendant Hospital failed to remove from Bello his Defendant Hospital's identification badge and other Defendant Hospital property which instead Bello retained, facilitating Bello's unauthorized entrance into the Premises on June 30th.

17. On June 30th Plaintiff started his day at 6:00 a.m. at Defendant Hospital as a medical resident in Family Practice tending to Defendant Hospital's patients.

18. On June 30th at about 3:00 p.m., while Plaintiff was writing patients' medical chart notes at a 16th Floor work station with other medical residents present, Plaintiff heard a medical student say "Code Silver," meaning there was an individual with a gun in Defendant Hospital.

19. According to Plaintiff, it was then, "the shit hit the fan."

20. Plaintiff states that moments later it was "mass pandemonium," with "voices shouting, people yelling, and no one knew what was going on."

21. According to Plaintiff, no general warning was broadcasted over Defendant Hospital's 16th Floor sound system.

22. Plaintiff, while seated at a work station in an enclosed area with the other medical students, observed the room's door swing open.

23. Plaintiff observed a male, later identified as Bello, who repeatedly fired his rifle into the area where Plaintiff and the other medical students were seated.

24. Plaintiff stood up, turned towards the door from where Bello fired a weapon, and Plaintiff was shot by Bello in his right chest area.

25. Plaintiff did not know he was shot until he saw a red hole in his shirt and his rib protruding through the shirt's hole.

26. Plaintiff, while looking at Bello, who was still pointing his weapon at Plaintiff, said, "Oh My God, I have been shot."

- 12 -

27. Bello, looked directly into Plaintiff's eyes and responded "That's right."

28. When Bello left the 16th Floor door area and walked a few feet to the Nursing Station, Plaintiff, who was seated next to a female medical resident, looked under the desk and observed the female medical resident shot in the neck.

29. Plaintiff asked the female medical resident if she was okay. She responded, "No" by shaking her head.

30. Plaintiff states that the desk area was full of blood with papers flying all around him.

31. While Bello was at the Nurses Station, Plaintiff grabbed the female medical resident's hand and said to the female medical resident, "We have been shot." "It's time to go."

32. Plaintiff pulled the female medical resident from under the desk and both Plaintiff and the female medical resident exited the room.

33. Upon exiting the room, Plaintiff, while holding the female medical student, observed Bello five to six feet away from him. Plaintiff observed a wall of fire, felt heat and smelled kerosene where Bello was located.

34. Bello faced Plaintiff and the female medical student while pointing his AR-15 at them and said to Plaintiff, "Come back here, I am going to find and get you, don't try to leave."

35. Plaintiff and the female medical resident escaped from Bello by entering the 16th Floor stairwell and both, seriously shot, took the stairs to the 11th Floor where a security officer escorted Plaintiff and the female medical resident to an elevator.

36. Due to the fire on the 16th Floor, the elevator stopped on the third floor where there were two other security officers placed Plaintiff on a bed sheet and Plaintiff was taken to the first floor Emergency Room.

37. Plaintiff recalled asking the security officer to call his mother and father to tell them he loved them, saying that he knew he was going to die.

38. After Plaintiff was shot on June 30th by Bello, Plaintiff was treated at Defendant Hospital for his gunshot wounds to his abdomen and right thigh.

39. Plaintiff was brought to Defendant Hospital's code room in agonal breathing, was intubated and multiple IV access was established, eight units of blood were given and fluid infused rapidly via pressure bags. Plaintiff was in distress. Plaintiff was then taken to Defendant Hospital's operating room for an exploratory laparotomy and exploratory thoracotomy, as well as, a right chest tube placement.

40. Due to Plaintiff's gunshot wounds, Plaintiff suffered a hemothorax, a laceration of the left and right lobe of the liver, a laceration of the anterior wall of the antrum of the stomach, a laceration of the small bowel at four places with one segment requiring gastric repair. Plaintiff sustained massive bleeding.

41. After surgery, Plaintiff was medically sedated, placed on a mechanical ventilator, treated with IV infusing medication, with a right chest tube to suction axillary and a Foley catheter inserted to drain Plaintiff's urine.

42. On July 1, 2017, Plaintiff was transferred to Mt. Sinai with an open abdomen, packing, intubated and sedated by IVs.

43. On July 3, 2017, at Mt. Sinai, Plaintiff underwent an exploratory laparotomy, small bowel resection and drainage of a left hepatic duct injury, removal of multiple laparotomy pads and lavage, cholecystecomy, cholangiography, debridement of the right anterior chest wound and rib, removal of intra-abdominal bullet fragments in the right sidewall, fascial closure, a repositioning of the right tube thorascostomy and postoperatively an ERCP was inserted in Plaintiff with a stent to the left distal biliary tree for a bile leak.

44.    While at Mt. Sinai, Plaintiff also had an endoscopic sphincterotomy with a stent placement for a left duct injury. Thereafter, the stent was removed at Mt. Sinai.

45.    Plaintiff also suffered liver lacerations from the gunshot wounds with punctate metal shrapnel in the ventral thoracoabdominal wall and liver with a 4.2 cm parapelvic cyst measuring above simple fluid attenuation and a proteinaceous cyst.

46.    Due to Plaintiff's gunshot wounds, Plaintiff was intubated until July 13, 2017.

47.    During the period Plaintiff was at Mt. Sinai, from July 3 to 21, 2017, Plaintiff suffered post operative respiratory failure, pneumothorax, an acute kidney injury, acute blood loss, anemia, a trauma thrombus burden to R iliac and R intrahepatic IVC, acute respiratory failure with hypoxia and a wound infection.

48.    On July 21, 2017, Plaintiff was discharged from Mt. Sinai with one JP drain and a disfiguring midline abdominal wound requiring a plastic surgery consultation.

49.    Due to Plaintiff's pain and suffering, Plaintiff was prescribed hydronmorphone, bacitracin, dabigatran, docusate sodium, sennosides and sodium hypochlorite.

50.    Plaintiff's life threatening, disfiguring and serious physical injuries from his gunshot wounds will require future continued medical evaluations. It is unknown whether any or all of the aforementioned injuries will result in any future surgeries.

51.    In addition to the serious physical injuries Plaintiff sustained from the gunshot wounds, Plaintiff's medical career was impacted upon by his inability to continue with his first year medical residency.

52. In addition to the serious physical injuries, Plaintiff has suffered post traumatic emotional distress.[18]

53. Plaintiff has sustained potential economic harm to Plaintiff's medical career.

54. Prior to June 30th Defendant Hospital had actual knowledge that its security system was ineffective.

55. After the shooting on November 11, 2011, at about 7:00 p.m., in Defendant Hospital's Emergency Room, Defendant Hospital, knew or should have known that Defendant Hospital's security system and protocols were ineffective to protect the public and its staff.

56. On and before June 30th, Defendant Hospital was negligent in failing to have an adequate security system in place to protect Plaintiff, all other Defendant Hospital's employees, its patients, guests, invitees and members of the public from any trespassers, violent acts or harm while they were on the Premises.

57. The June 30th shooting by Bello occurred due to the negligent breach of duty by Defendant Hospital to those who were lawfully on Defendant Hospital's Premises. Consequently, Plaintiff sustained serious physical and emotional injuries caused by Defendant Hospital's gross negligence and carelessness by allowing Bello to enter the Premises with an AR-15 and gasoline.

58. As a result, Plaintiff was seriously physically injured, emotionally and economically harmed by Defendant Hospital's negligence and carelessness, without any negligence on the part of Plaintiff contributing thereto.

---

[18] In addition to Plaintiff suffering emotional distress, other Defendant Hospital staff members did also. "Another twenty Defendant Hospital staff members, most who worked on the 16[th] and 17th floors where the shooting occurred, also have not yet returned" to work. Source: August 20, 2017, *New York Times*, "Branded in Fire, Staff at Bronx-Lebanon Hospital recovering from Tragedy," quoting Dr. Sridhar Chilimuri, Defendant Hospital's Physician-In-Chief.

59.     By reason of the foregoing, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court and both compensatory and punitive damages are being sought against Defendant Hospital.

## SECOND CAUSE OF ACTION
## DEFENDANT HOSPITAL'S NEGLIGENCE-FAILURE
## TO OBTAIN BELLO'S DEFENDANT HOSPITAL'S
## IDENTIFICATION CARD AND PROPERTY UPON TERMINATION
## OF BELLO'S EMPLOYMENT

60.     Plaintiff repeats, reiterates and realleges the allegations set forth in Paragraphs 1 to 10, and 11 to 59, above as if set forth fully herein and at length.

61.     Upon Bello's termination from Defendant Hospital's employment in 2015, Defendant Hospital was required to have Bello surrender any and all Defendant Hospital's property that would permit Bello's entrance to or the use of any part of the Premises.

62.     Upon Bello's termination of his Defendant Hospital's employment, Defendant Hospital failed to remove from or have Bello surrender any of Defendant Hospital's property which permitted Bello's unauthorized entrance and use of the Premises.

63.     Due to Defendant Hospital's negligence and its failure to have Bello surrender any Defendant Hospital's property, on June 30th Defendant Hospital created a dangerous and hazardous condition at the Premises permitting Bello, dressed in a doctor's white coat, wearing a hooded sweat shirt over his head to conceal his identity and possessing a Defendant Hospital identification badge to bypass Defendant Hospital's security officer(s) while he had an AR-15 rifle on his person.

64.     As a result, Plaintiff was shot after Bello proceeded to the Premises' 16th and 17th floors where he repeatedly and randomly discharged his AR-15 rifle.

65. Plaintiff was seriously physically injured, emotionally and economically harmed by Defendant Hospital's negligence and carelessness, without any negligence on the part of Plaintiff contributing thereto.

66. By reason of the foregoing, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court and both compensatory and punitive damages are being sought.

### THIRD CAUSE OF ACTION
### NEGLIGENT HIRING AND CONTINUED EMPLOYMENT
### OF BELLO BY DEFENDANT HOSPITAL

67. Plaintiff repeats, reiterates and realleges the allegations set forth in Paragraphs 1 to 10, 11 to 59, and 60 to 66 above as if set forth fully herein and at length.

68. Defendant Hospital's liability pre-dated the June 30th, shooting of Plaintiff at Defendant Hospital's Premises with Bello's negligent hiring by Defendant Hospital in 2015.

69. Defendant Hospital negligently failed to properly conduct a background check of Bello, or disregarded it, which would have disclosed material pre-employment issues concerning Bello's medical credentials, past employment, anti-social and criminal history.

70. Prior to June 30th, while Bello was a Defendant Hospital employee, he was accused of sexually harassing and/or sexual misconduct of a Defendant Hospital female employee.

71. Defendant Hospital failed to notify any law enforcement agency that Bello was accused of sexual harassment and/or sexual misconduct by the female Defendant Hospital employee and negligently permitted Bello to continue with his Defendant Hospital employment.

72. Defendant Hospital, by not filing a police report, precluded Bello's arrest for alleged sexual misconduct which would have resulted in an Order of Protection being issued by a New York City Criminal Court protecting Defendant Hospital's female employee from Bello's misconduct and prohibiting Bello from entering the Premises.

73.     Defendant Hospital's 2015 negligent hiring and continued employment of Bello, while having knowledge or should have had knowledge of Bello's negative background and past criminal conduct, Defendant Hospital created a dangerous condition by employing Bello.

74.     As a result, Plaintiff was seriously physically injured, emotionally and economically harmed by Defendant Hospital's negligence and carelessness, without any negligence on the part of Plaintiff contributing thereto.

75.     By reason of the foregoing, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court and both compensatory and punitive damages are being sought.

### FOURTH CAUSE OF ACTION
### DEFENDANT HOSPITAL'S NEGLIGENT INFLICTION
### OF EMOTIONAL DISTRESS TO PLAINTIFF

76.     Plaintiff repeats, reiterates and realleges the allegations set forth in Paragraphs 1 to 10, 11 to 59, 60 to 66 and 67 to 75 above as if set forth fully herein and at length.

77.     For approximately ten days after June 30th, Plaintiff was intubated and in a coma due to the serious physical injuries Plaintiff sustained after being shot by Bello at Defendant Hospital.

78.     During this post June 30th ten day period, Plaintiff was physically unable to contact his family members concerning his physical condition and what occurred on June 30th.

79.     On June 30th, Plaintiff's family was not timely notified by Defendant Hospital that Plaintiff was a shooting victim who suffered serious physical injuries at Defendant Hospital.

80.     As part of Defendant Hospital's employment records, Plaintiff's family emergency contact name and number was provided by Plaintiff when he commenced his medical residency with Defendant Hospital.

81.    Defendant Hospital negligently failed to timely notify Plaintiff's emergency contact person that Plaintiff was seriously wounded at the Premises.

82.    Plaintiff's mother and father were in Canada when they heard about Defendant Hospital's shooting, and without any Defendant Hospital notification that Plaintiff was one of Bello's victims, they proceeded to fly to New York City believing Plaintiff was hurt.

83.    When Plaintiff discovered that no family member or emergency contact person was timely notified by Defendant Hospital, this caused Plaintiff to suffer additional emotional stress and strain.[19]

84.    To date, no one from Defendant Hospital's administration has contacted either Plaintiff or Plaintiff's family concerning how Plaintiff was injured or to offer any support, with the exception of Plaintiff's Defendant Hospital's surgeon who operated on Plaintiff on June 30th and Plaintiff's supervisor checking on his recovery.[20]

85.    As a result, Plaintiff was seriously physically injured, emotionally and economically harmed by Defendant Hospital's negligence and carelessness, without any negligence on the part of Plaintiff contributing thereto.

86.    By reason of the foregoing, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court and both compensatory and punitive damages are being sought.

---

[19]    Defendant Hospital's callousness continued after Plaintiff was released from Mt. Sinai. On two occasions, Plaintiff's attorney corresponded with Miguel Fuentes, Defendant Hospital's President seeking information on Plaintiff's behalf and, with Plaintiff's consent, seeking Plaintiff's personnel file. As of the date of this Complaint, Fuentes nor anyone from Defendant Hospital's staff has contacted Plaintiff or his attorney in response to the letters and the personnel file request.

[20]    To date, Plaintiff also has not been contacted by anyone from the New York Police Department investigating the June 30th shooting. However, Plaintiff's mother was contacted by someone from NYPD's Community Affairs Unit, sometime after the June 30th shooting, leaving a voice message to attend a community event. Plaintiff and his mother did not attend.

### FIFTH CAUSE OF ACTION
### NEGLIGENT ENTRUSTMENT
### BY DEFENDANT GUNS

87.     Plaintiff repeats, reiterates and realleges the allegations set forth Paragraphs 1 to 10, 11 to 59, 60 to 66, 67 to 75 and 76 to 86 above as if set forth fully herein and at length.

88.     On June 22, 2017, when Defendant Guns, a licensed firearm's dealer, sold Bello a modified AR-15 rifle, Defendant Guns put in motion a chain of events resulting in Bello causing death and serious gunshot wounds to Plaintiff and others at the Premises.

89.     Defendant Guns, in accordance with federal and New York State laws, failed to properly and thoroughly conduct a background investigation of Bello prior to selling the AR-15 rifle to Bello on June 22, 2017.

90.     Defendant Guns, if it properly investigated and verified Bello's New York City residence, would have had or should have had knowledge that Bello, as a City of New York resident, was required to have a NYPD Rifle Permit for an AR-15 rifle.

91.     Defendant Guns failed to verify with NYPD if Bello had an NYPD Permit to possess an AR-15 rifle in the City of New York.

92.     Defendant Guns negligently sold to Bello the AR-15 rifle and ammunition which was the proximate cause of Plaintiff sustaining his serious personal injuries when Bello shot Plaintiff on June 30th.

93.     As a result, Plaintiff was seriously physically injured, emotionally and economically harmed by Defendant Guns negligence and carelessness, without any negligence on the part of Plaintiff contributing thereto.

94.     By reason of the foregoing, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court and both compensatory and punitive damages are being sought.

## SIXTH CAUSE OF ACTION
## NEGLIGENT PER SE BY DEFENDANT GUNS

95.     Plaintiff repeats, reiterates and realleges the allegations set forth in Paragraphs

1 to 10, 11 to 59, 60 to 66, 67 to 75, 76 to 86 and 87 to 94 above as if set forth fully herein and at

length.

96.     The City of New York mandates that any possessor of any rifle and

ammunition for a rifle in the City of New York must have an NYPD Permit.[21]

97.     *Administrative Code of the City of New York § 10-303.* Permits for possession

and purchase of rifles and shotguns, states:

> "It shall be unlawful to dispose of any rifle or shotgun to any person
> unless said person is the holder of a permit for possession and
> purchase of rifles and shotguns; it shall be unlawful for any person to
> have in his or her possession any rifle or shotgun unless said person
> is the holder of a permit for the possession and purchase of rifles and
> shotguns. The disposition of a rifle or shotgun, by any licensed dealer
> in rifles and shotguns, to any person presenting a valid rifle and shot
> gun permit issued to such person, shall be conclusive proof of the
> legality of such disposition by the dealer."[22] [23]

---

[21]    *Administrative Code of the City of New York § 10-303.* Grounds for Denial of Permit. An
application for a rifle/shotgun permit may be denied [if] for lack of good moral character or
other good cause, pursuant to section 10-303 of the Administrative Code, based on the
following reasons: (a) The applicant has been arrested, indicted or convicted for [any] a
crime or violation except minor traffic violations, in any [jurisdiction,] federal, state or local
jurisdiction. According to the *New York Times,* July 2, 2017,"Bronx Hospital Shooting:
What We Know and What We Don't Know, Bello had a prior criminal record that he was
convicted of unlawful imprisonment in the second degree, a misdemeanor, which would have
disqualified Bello from receiving an NYPD rifle permit.

[22]    Pursuant to the New York State *Penal Law § 265.00 (6).* Dispose Of is defined as - To
dispose of, give away, give, lease, loan, keep for sale, offer, offer for sale, sell, transfer or
otherwise dispose of.

[23]    *Administrative Code of the City of New York § 10-131(h) Firearms.* Rifles and shotguns;
carrying or possessing. "1. It shall be unlawful for any person to carry or possess a loaded
rifle or shotgun in public within the city limits. Any person who shall violate this paragraph
shall be guilty of a misdemeanor punishable by a fine of not more than one thousand dollars,
or imprisonment not exceeding one year, or by both such fine and imprisonment."

*Administrative Code of the City of New York § 10-303(5)* states:

"Notwithstanding the provisions of paragraphs two, three and four of this subdivision, any person authorized to possess a rifle within the city of New York may possess ammunition suitable for use in such rifle and a dealer in firearms or dealer in rifles and shotguns may dispose of such ammunition to such person pursuant to section 10-306."

The *Administrative Code of the City of New York § 10-306 (c)* states:

"No ammunition suitable for use in a rifle of any caliber or for any shotgun or ammunition feeding device which is designed for use in a rifle or shotgun and which is capable of holding no more than five rounds of rifle or shotgun ammunition shall be disposed of to any person who has not been issued a rifle and shotgun permit and a certificate of registration and who does not exhibit same to the dealer at the time of the purchase. In no event shall rifle or shotgun ammunition be disposed of to or possessed by any such person except for a shotgun, or for the specific caliber of rifle, for which the certificate of registration has been issued. No ammunition feeding device which is designed for use in a rifle or shotgun and which is capable of holding more than five rounds of rifle or shotgun ammunition shall be disposed of by a dealer in rifles and shotguns to any person who does not exhibit proof that he or she is exempt from subdivision a of section 10-303.1 pursuant to section 10-305.

"(d). It shall be unlawful for any person who is required to have a permit in order to possess a rifle or shotgun and who has not been issued such permit to possess rifle or shotgun ammunition or an ammunition feeding device which is designed for use in a rifle or shotgun.

"(e). A record shall be kept by the dealer of each disposition of ammunition or ammunition feeding devices under this section which shall show the type, caliber and quantity of ammunition or ammunition feeding devices disposed of, the name and address of the person receiving same, the caliber, make, model, manufacturer's name and serial number of the rifle or shotgun for which the purchaser is purchasing ammunition, the date and time of the transaction, and the number of the permit and certificate exhibited or description of the proof of exemption exhibited as required by this section. Such

information shall be made available to all law enforcement agencies."[24]

98. The *Gun Control Act of 1968,* specifically, *18 U.S.C. 922.* Unlawful Acts,

states:

> "(b) makes it unlawful for any licensed firearms dealer, (Defendant Guns), to sell or deliver "(2) any firearm or ammunition to any person in any State where the purchase or possession by such person of such firearm or ammunition would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance;"

99. On June 22, 2017, Defendant Guns', a licensed firearm's dealer, had a duty

to comply with *18 U.S.C. 922(b)(2),* and the aforementioned local New York City statutes

("published ordinances") which strictly make Defendant Guns liable for any violation which resulted

in harm to Plaintiff for the AR-15 rifle sold to Bello.

100. According to ATF, "It is critical that federal firearm licensees comply with

the *Gun Control Act of 1968,* and its implementing regulations, in order to assist law enforcement

---

[24] *Administrative Code of the City of New York § 10-310.* Violation. "Except as is otherwise provided in sections 10-302 and 10-303.1, violation of sections 10-301 through 10-309 shall be a misdemeanor punishable by a fine of not more than one thousand dollars or imprisonment of not more than one year or both, provided that the first violation of such sections involving possession of an unregistered rifle or shotgun or rifle or shotgun ammunition or an ammunition feeding device which is designed for use in a rifle or shotgun and which is capable of holding no more than five rounds of rifle or shotgun ammunition shall be an offense punishable by a fine of not more than three hundred dollars or imprisonment of not more than sixteen days, or both on condition that (a) the first violation of possession of an unregistered rifle or shotgun or rifle or shotgun ammunition or an ammunition feeding device which is designed for use in a rifle or shotgun and which is capable of holding no more than five rounds of rifle or shotgun ammunition is not in conjunction with the commission of a crime and (b) the possessor has not been previously convicted of a felony or a serious offense and (c) the possessor has not previously applied for and been denied a permit for such possession."

efforts, prevent the diversion of firearms from lawful commerce to the illegal market, ensure successful tracing of firearms, and to protect the public."[25]

101.    Defendant Guns' failed to comply with these aforementioned statutes by not contacting NYPD to determine if Bello was issued a NYPD Rifle Permit before selling Bello the AR-15 rifle since Bello's domicile, the final disposition of the weapon, was New York City.

102.    As a result, Plaintiff was seriously physically injured, emotionally and economically harmed by Defendant Gun's negligence and carelessness, without any negligence on the part of Plaintiff contributing thereto.

103.    By reason of the foregoing, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court and both compensatory and punitive damages is being sought.

**WHEREFORE,** Plaintiff seeks judgment in his favor for the Six Causes of Action as set forth above as follows:

A.    Compensatory damages against Defendants Hospital and Guns in a sum greater than $75,000.00, plus costs and disbursements of this action;

B.    Punitive damages against Defendants Hospital and Guns, and

C.    Any and all additional relief as may appear just and proper.

---

[25]    Source: ATF's Fact Sheet-Federal Firearms Compliance Inspections and Revocation Process, dated March, 2016, found on ATF's website: www.atf.gov/resource-center/fact-sheet.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 28, 2018

**LAW OFFICES OF ARNOLD N. KRISS**
Attorneys for Plaintiff
**JUSTIN TIMPERIO**
Office and Post Office Address
123 William Street-15th Floor
New York, New York  10038
(212) 577-2000
Email: akriss@lawkriss.com

BY: _____

**ARNOLD N. KRISS, ESQ. (5294)**